**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William Joseph VALENTINE,**
**Defendant-Appellant.**

**No. 81–1850.**

United States Court of Appeals,
Tenth Circuit.

April 20, 1983.

Vince D'Angelo of D'Angelo, McCarty & Vigil, Albuquerque, N.M., for defendant-appellant.

Larry Gomez, Asst. U.S. Atty., Albuquerque, N.M. (R.E. Thompson, U.S. Atty., Albuquerque, N.M., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY and SEYMOUR, Circuit Judges, and KELLY, District Judge.*

HOLLOWAY, Circuit Judge.

William Joseph Valentine brings this direct appeal from his conviction on all counts of a seven count indictment. Counts One and Three charged Valentine with possession on or about April 7, 1981, of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Two charged distribution on or about April 7, 1981, of cocaine under the same statutes. Counts Four and Five charged receipt on or about March 20, 1981, of firearms, after former conviction of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(h)(1) and 924(a). Counts Six and Seven charged possession on or about April 7, 1981, of the same firearms involved in Counts Four and Five, after former conviction, in violation of 18 U.S.C.App. § 1202(a).

On each of the first three counts Valentine was sentenced to concurrent terms of eight years' imprisonment with a special parole term of five years. On each of Counts Four and Five a sentence of five years was imposed, and on each of the final two counts Valentine was sentenced to two years' confinement. The latter four sentences also were ordered to run concurrently with the sentences on the first three counts.

I

For convenience the basic facts will be outlined as a background for our consideration of the issues presented.

* The Honorable Patrick F. Kelly of the United States District Court for the District of Kansas, sitting by designation.

The evidence shows that Valentine was suspected of being a dealer in cocaine because of information supplied by a confidential informant, one "Mickey" Rooney. Rooney told Detective Robert Milliman of the Albuquerque Police Department that Carolyn Chalamidas was willing to sell cocaine.[1] Rooney further informed Milliman that Chalamidas's source for cocaine was a man named "Bill" or "Bill Valentine," and that Valentine lived on Sixth Street.[2]

Detective John Hearn arranged to meet Chalamidas through Rooney. On the afternoon of April 7, 1981, one day after Rooney contacted Milliman, Hearn met Chalamidas at her apartment. Hearn gave Chalamidas $2,500 in one hundred dollar bills for the purchase of one ounce of cocaine. The serial numbers of the bills had been recorded by photocopying. Hearn, Chalamidas and Rooney then drove to a doughnut shop near Valentine's residence where the two men were to wait while Chalamidas made the cocaine purchase. Valentine's residence was under surveillance at this time by various federal and local officers. IV R. 121. Chalamidas was seen arriving at Valentine's residence a few minutes after leaving Hearn and Rooney. She entered the house, stayed about ten minutes, and came out accompanied by Valentine. She and Valentine talked briefly before she departed. IV R. 122.

Chalamidas then picked up Rooney and Hearn and the three of them returned to her apartment. Chalamidas produced an ounce of cocaine in a plastic bag which she carefully weighed for Hearn. IV R. 102–03. Chalamidas took out five grams of the powder as her fee for arranging the purchase and gave Hearn the remaining twenty-three grams. IV R. 103. This twenty-three gram package was Government's Exhibit One at trial and is the subject of Counts One and Two.

Upon completing the purchase Hearn stepped outside the apartment and signaled to other officers who were waiting at the scene. Chalamidas was then arrested and the entire apartment searched pursuant to a search warrant that had been obtained earlier that day. IV R. 104. One of the one hundred dollar bills given Chalamidas for the drug purchase was found in her purse.

A few hours later, at about 7:30 p.m., Valentine was arrested when the officers executed the search warrant for his house. The guns involved in Counts Four through Seven were seized along with two other weapons, a bag of cocaine weighing about

1. Chalamidas was charged with Valentine in Counts I and II of the indictment but was not tried with Valentine, apparently because she failed to appear after her release on bond. IV R. 85.

2. Before trial, defendant moved to suppress all evidence seized in the execution of a search warrant at his residence on Sixth Street on the basis that the affidavit supporting the search warrant contained statements attributed to Rooney that Rooney had not made, according to defense counsel. III R. 7–8. Rooney, who did not testify at trial, was called to testify at a pretrial hearing on the motion to suppress. III R. 17. At this hearing defense counsel elicited testimony from Rooney to the effect that he could not have identified the defendant by his last name because he did not know the defendant's last name at that time. III R. 21.

Furthermore, Rooney testified that he could not have specified which house on Sixth Street was Valentine's residence because Rooney had only been in that immediate vicinity on one occasion at which time he was giving Chalamidas a ride; Chalamidas had gotten off at the corner and Rooney said he did not know which of two houses she had entered. III R. 22. Rooney's testimony was vague and contradictory. More importantly, he admitted that he had injected half a gram of cocaine shortly before the first meeting with Milliman; he admitted, and from the transcript it appears obvious, that he really could not remember specifically how much he told Milliman at that meeting. III R. 22–25. Milliman testified at the hearing that Rooney gave the name "Bill Valentine" and pointed out Valentine's house on Sixth Street. III R. 62. Furthermore, the defendant's name and address previously had been revealed to other investigating officers as connected with cocaine traffic. III R. 61, II R, Exhibit 1.

Valentine still contends that the prosecution never proved that the Sixth Street house was his residence. See infra, n. 8 and accompanying text. Our occasional references to the house as his residence are made for convenience only; we do not find it necessary to resolve this issue.

twelve ounces (Exhibit 5, the subject of Count Three), a number of plastic bags, scales, and a number of substances that could have been used to dilute cocaine. After a search of Valentine's person, four of the one hundred dollar bills given to Chalamidas by Hearn were also discovered. One other person was present when the warrant was executed. He also was placed under arrest, but was not charged with Valentine.

## II

Valentine first challenges the ruling by the trial court refusing to permit a line of cross-examination of a Government expert. The facts pertaining to this issue follow.

Among the witnesses testifying for the prosecution at trial was Martin Brady, "criminalist" for the Albuquerque Police Department. Brady testified that he had analyzed the substances found in Government's Exhibits One, Two and Five,[3] and that all three substances were uncut cocaine. Based on his analysis Brady testified that the cocaine could have come from the same source.

On cross-examination, Valentine's attorney attempted to refute Brady's conclusion that the three samples of cocaine could have come from the same source. Counsel first elicited from Brady the statement that he could not testify that the samples did in fact come from the same source. Next the defense attorney questioned Brady about the descriptions Brady had given in his reports. Brady confirmed that he had described Exhibits One and Two as powdery substances with lumps, and that Exhibit Five was different, being one large lump that broke into a powder. Further, Brady testified that he noticed a strong odor from Exhibits One and Five but not from Exhibit Two.

At that point in the cross-examination defense counsel sought to have Brady open the packages to make a closer visual inspection of the cocaine samples. The trial judge interrupted and questioned the necessity of such an examination. Counsel explained that he expected the visual examination of the exhibits would show that Exhibits One and Two were composed of flakes and that Exhibit Five had a powdery composition. This would strongly tend to disprove the prosecution's theory that Exhibits One and Two came from the bag of cocaine found in Valentine's house (Exhibit Five). The court refused to allow counsel to conduct this examination. After making an offer of proof counsel elicited from Brady the testimony that different samples of uncut cocaine may have different textures and that such a difference could indicate that such samples did not come from a common source. Brady stated that he had not conducted such an examination of the exhibits.

Valentine contends that the limitation of his cross-examination of Brady deprived him of his constitutional right to due process under the Fifth Amendment and of his Sixth Amendment rights of confrontation and effective assistance of counsel. The trial court ruled that the proposed line of questioning was not "proper cross-examination" and was "not probative of anything." IV R. 196–97.

It is difficult to agree that the proposed questioning was without probative value. The prosecution's case on Counts One and Two was entirely circumstantial—the only link between Valentine and the cocaine that he is charged with possessing and distributing under those counts was Chalamidas. Proof that this cocaine came from a source other than the bag of cocaine found at Valentine's house would weaken the inference that Chalamidas acquired the cocaine from Valentine. Nevertheless we are not persuaded that any reversible error occurred.

■ We have held that errors in limiting cross-examination are of two types. When such an error precludes inquiry into an entire *area* of relevant cross-examination, the right of confrontation derived from the

---

3. Exhibit One was the twenty-three gram package that Chalamidas sold to Hearn. Exhibit Two was the five gram package kept by Chalamidas and seized upon her arrest. Exhibit Five was the twelve ounce bag of cocaine found in the kitchen of Valentine's residence.

Sixth Amendment is infringed. *United States v. Jorgenson,* 451 F.2d 516, 519 (10th Cir.1971). The second type of error limits only the *extent* of cross-examination; this is a matter of the trial judge's discretion and will not lead to reversal unless an abuse of discretion, clearly prejudicial to the defendant, is shown. *Jorgenson,* 451 F.2d at 520; *United States v. Alderete,* 614 F.2d 726, 728–29 (10th Cir.1980); *United States v. Walton,* 552 F.2d 1354, 1363–64 (10th Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977).

■ The record here clearly shows that Valentine was not excluded completely from the area of cross-examination that he attempted to pursue. Counsel was allowed to question Brady concerning the inference that the cocaine could have come from the same source and succeeded in demonstrating that some of Brady's own observations were not entirely consistent with that inference. Therefore we turn to the question whether the limitation on questioning of Brady was clearly prejudicial to Valentine.

We conclude that Valentine has failed to show that his defense was clearly prejudiced. We are unable to agree with Valentine's appraisal of the importance of the proposed line of questioning. Even if the proposed inquiry and study of the samples had been allowed and had produced the result that Valentine apparently expected, the jury might well have concluded simply that Valentine had more than one "batch" of cocaine at his residence. Moreover, when the alternatives are considered it is clear that this is not mere speculation but instead is the most reasonable conclusion in the circumstances.

The testimony was that approximately fifteen to twenty minutes elapsed from the time when Chalamidas left Hearn and Rooney at the doughnut shop until she returned, that Chalamidas was in Valentine's

house for about ten minutes during this interval and outside the house talking to Valentine for another few minutes, and $400 of the $2,500 in marked money was found on Valentine, while one of these bills was found in Chalamidas's purse. Thus for the jury to have concluded from evidence of different sources of cocaine that there was reasonable doubt as to Valentine's involvement in this sale, the jurors would have had to draw one of the following conclusions. First, they might infer that Chalamidas already had the cocaine and went to Valentine and paid him part of the marked money for an unrelated purpose. Or, second, the jury might infer that Chalamidas went to a different source and obtained the cocaine with part of the marked money, then went to Valentine and paid him part of the money for an unrelated purpose, and then returned to Hearn. The weaknesses of both scenarios is apparent. If Chalamidas already had the cocaine, there is no logical reason why she went through the charade of going to Valentine. The second alternative is unrealistic because of the obvious time constraints.

Thus, even assuming that the cross-examination could have shown that the cocaine exhibits came from different batches, when these far-fetched scenarios are analyzed, they fail when compared to the more logical and realistic inference that Valentine, who clearly was proven to have had control of fairly substantial quantities of cocaine, had simply sold to Chalamidas cocaine that came from a different source than that later found in his dwelling. We feel that defendant has failed to show that he was clearly prejudiced by the trial court's ruling. Accordingly we conclude that the trial judge's ruling was not an abuse of discretion. *United States v. Jorgenson,* 451 F.2d at 520.[4]

---

4. Valentine's reliance on *White v. Maggio,* 556 F.2d 1352 (5th Cir.1977), is unavailing. There, a denial of confrontation was found but the prosecution had denied the defendant's requests for pretrial examination of critical physical evidence by an expert of the defendant's choice. We think the cases are fundamentally distinct. In the instant case the defendant elected not to have an independent pre-trial appraisal of the evidence but to attempt to bring out helpful evidence on cross-examination. In doing so, Valentine now must show a reversible error in the limitations imposed on cross-examination, which he has not done.

III

Valentine presses related arguments concerning the joinder of Counts One through Three (the cocaine offenses) with Counts Four through Seven (the firearms offenses), and the denial of severance of the two groups of charges for trial.

Joinder of offenses is governed initially by Rule 8(a) of the Federal Rules of Criminal Procedure, which provides:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Valentine says that the cocaine and firearms offenses are not of the same or similar character and that the Government failed to prove that he possessed both the cocaine and the weapons as part of a common plan to sell cocaine for profit.

The Government replies that the guns and a large quantity of cocaine were found in the kitchen of the residence, along with other paraphernalia such as scales and "cutting" agents, which is sufficient to indicate a common scheme or plan. We agree. From such circumstantial evidence there was a sufficient showing that the firearms and the drug were being used in pursuit of a common unlawful activity. *See United States v. Park,* 531 F.2d 754, 761 (5th Cir. 1976). Hence the joinder of the charges in one indictment was not improper.[5]

The question remains whether severance should have been ordered under Rule 14, F.R.Crim.P. Defendant moved orally for such severance of the two groups of charges for trial at a pre-trial hearing on motions, at the start of the trial, and at the conclu-

sion of the Government's case. The first motion was based solely on the fact that evidence of Valentine's prior conviction for burglary would be an essential element of the prosecution's case in Counts Four through Seven, but would not be admissible otherwise on the first three counts. In renewing the motion at the start of trial, counsel in addition informed the court that the defendant desired to testify on the weapons counts but not on the others.

In the final motion, at the conclusion of the Government's case, the court was informed about the nature of the testimony that Valentine would give on the weapons charges and of a further reason for Valentine's wish not to testify on the cocaine counts. Counsel stated that, besides avoiding introduction of evidence of defendant's prior conviction by not testifying on the cocaine charges, Valentine needed to avoid taking the stand because the Government had failed to prove that he lived in the house where he had been arrested, a vital link that the defendant would have had to supply had he testified. As to the testimony that Valentine wished to give on the weapons counts, counsel said that the defendant would say that the guns were left at the house against Valentine's wishes and that Valentine had attempted to contact the owner of the guns in order to have them removed. In addition, Valentine now argues that the denial of severance was inherently prejudicial as the jury was likely to be influenced by the sheer number of violations alleged. Appellant's Reply Brief at 8–9.

Even though counts are properly joined in an indictment, the trial court may order a severance for trial under Rule 14 if the defendant, or the prosecution, is prejudiced thereby.[6] However, "[t]he decision to grant a severance is within the sound discretion of the trial court and its decision

---

5. We note that any objection to the joinder of the charges in the indictment was required to have been raised by a pretrial motion. Rule 12(b)(2), F.R.Crim.P.

6. Rule 14 provides in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses ... for trial together, the court may order an election or separate trials of counts ... or provide whatever other relief justice requires.

will not ordinarily be reversed in the absence of a strong showing of prejudice." *United States v. Strand,* 617 F.2d 571, 575 (10th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). The burden of the defendant to show an abuse of discretion in this context is a difficult one. *United States v. Van Scoy,* 482 F.2d 347 (10th Cir.1973).

■ Valentine first says that the jury might have been influenced by the combination of charges. It is well known, the argument goes, that drug dealers often are armed, so the suggestion of involvement with firearms bolstered the prosecution's case on the drug charges, and vice versa. We feel, however, that there was no essential unfairness when the relationship of the charges grew out of the defendant's own conduct. Moreover, the mere fact that a defendant may have a better chance for acquittal by separate trials of charges is not sufficient to require severance. *Strand,* 617 F.2d at 575.

■ Defendant contends further that he was prejudiced by the refusal to sever because in a separate trial for the cocaine charges, evidence of his prior conviction for burglary would have been inadmissible, citing *United States v. Busic,* 587 F.2d 577 (3d Cir.1978), *rev'd on other grounds,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). In *Busic* the Third Circuit held that the defendants had not been prejudiced by the denial of severance because evidence of the prior convictions would have been independently admissible in a separate trial to rebut the entrapment defense raised. Nevertheless, the court was sufficiently concerned about the problem in general to offer guidance to the district courts for future cases. The guideline adopted there was that severance should be granted where evidence of the prior conviction would be admissible on one or more counts but inadmissible on others. 587 F.2d at 585.

We recognize the persuasiveness of this guideline as an important factor in determining whether severance is advisable to assure a fair trial. However, we note again that we are not persuaded that unfair prejudice resulted here since relationship of the charges grew out of the defendant's own conduct. Moreover, Valentine's prior conviction was not given unnecessary or undue emphasis at trial. The conviction was established through the testimony of defendant's probation officer and the introduction of a certified copy of the judgment of conviction for commercial burglary. No details of the offense were presented to the jury. The only mention of the prior conviction in closing argument was likewise brief and limited to establishing the fact of the conviction as an element of the weapons offenses. V R. 219. We cannot agree that Valentine has made a persuasive showing of prejudice.[7]

Valentine's second and third requests for severance were based on his desire to testify concerning the firearms counts but not as to the cocaine charges. Valentine concedes that severance is not required in all such instances. Appellant's Brief at 23. In the motion for severance at the start of trial, defense counsel informed the court that Valentine wished to testify as to the weapons charges, but gave no indication what the testimony might concern. The only reason given for not wanting to testify

---

**7.** Although we are convinced that Valentine was not substantially prejudiced by the denial of severance, we note that in similar cases we have relied on the giving of limiting instructions to safeguard the accused from the possibility that the jury might view a prior conviction as evidence of predisposition to commit the crimes charged. *United States v. Roe,* 495 F.2d 600, 604 (10th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 107, 42 L.Ed.2d 92 (1974). Likewise, in cases involving multiple counts without the prior conviction aspect in upholding denials of severance we have relied on the fact that limiting instructions were given that each count must be given separate consideration. *United States v. Strand,* 617 F.2d 571, 575 (10th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *United States v. Kellerman,* 432 F.2d 371, 375 (10th Cir.1970). Although limiting instructions on the consideration to be given to the prior conviction and on separate consideration of each count were not given here, no error is claimed in this regard. However, such instructions should be given to assure defendants the fairest trial possible.

on the drug counts was that he could thus avoid introduction of the prior conviction on impeachment grounds and it would not have been before the jury on the drug charges.

■ Both parties cite *Baker v. United States,* 401 F.2d 958 (D.C.Cir.1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), on this issue. The guidelines offered in *Baker* strike an appropriate balance between the competing policies of preservation of the accused's important rights and economical judicial administration. We therefore restate those guidelines here:

> [N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.

401 F.2d at 977 (footnotes omitted).

■ Under this standard the defendant's claim of error in the denial of his severance motion made at the start of trial falters. The trial judge was then given no indication of the nature of the testimony Valentine would give on the firearms charges.

■ The remaining question is whether it was proper to deny the motion when renewed at the conclusion of the prosecution's case. We also find no abuse of discretion in the trial court's refusal to grant severance at that late stage of the case. It was then explained by counsel that the testimony that Valentine wished to give on the weapons counts was that the guns were brought to his residence and left there against his will and that he tried to contact the guns' owner, Ammon, to have them removed. IV R. 205–206. This proffered testimony would have been cumulative; Ammon had testified to the same facts. IV R. 173–79.

The additional reason given for defendant's wishing not to testify on the cocaine counts was also weak. Valentine's counsel asserted that the Government had failed to prove that the Sixth Street house where he was arrested was in fact his residence, a fact that he says he would have had to supply for the prosecution had he testified. We agree that the prosecution never proved that the Sixth Street house was Valentine's residence, but that is not a fatal defect. Reviewing the record as a whole we find ample evidence in any event to show Valentine's continuing presence at the house, from which the jury easily could have made the essential finding that Valentine had possession of the guns and the cocaine.[8] The residence of the defendant was not an essential element of any of the offenses charged.

In sum, we find no abuse of the trial court's discretion in its rulings denying severance.

**IV**

Valentine contends further that there was a failure of proof on the weapons counts requiring reversal of those convictions. Ammon was the only witness who testified on this issue other than one of the arresting officers. The officer merely testified that the guns were found in the kitchen of the house when the warrant was executed. Ammon's testimony was that he brought the pistol and the shotgun to defendant's house and left them as collateral for money he owed to defendant. On cross-examination Ammon testified, as noted in

---

8. One reference to the evidence should suffice to illustrate this point. Ammon testified that he delivered the guns to Valentine "at his house" in mid-to-late-March of 1981. IV R.

174. Valentine says there was no proof that he ever handled the guns. The guns were found at the Sixth Street house on Valentine's arrest on April 7, 1981.

Part III, that Valentine objected to having the guns left at his house and had tried to contact Ammon thereafter, presumably to ask Ammon to retrieve the guns.

Valentine argues that because there was no evidence presented to refute Ammon's testimony, given as a Government witness, the weapons convictions cannot stand. Valentine also says he was in an impossible position, that when the guns were left with him it was without his consent, and that if he had done anything to remove them, he would have taken possession of them. Defendant also points to an instruction that informed the jury that "[a]n act . . . is 'knowingly' done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." I R. 48. Valentine says that the guilty verdicts returned on the weapons charges without evidence that Valentine intended to possess the guns demonstrate again that he was prejudiced by the denial of severance for trial because the evidence on the other charges prejudiced him before the jury and led to his convictions on the weapons counts.

 In gauging the sufficiency of the evidence we must view it at this stage in the light most favorable to the Government, remembering that the evaluation of the credibility of the witnesses was for the jury, and not the appellate court. *United States v. Twilligear,* 460 F.2d 79, 81–82 (10th Cir.1972). We conclude that the direct and circumstantial evidence on the weapons charges was sufficient for the jury's conclusions that Valentine unlawfully received and possessed the guns. The jury was not bound to adopt the view that Valentine did not voluntarily and intentionally receive and possess the weapons found in the house where the cocaine was located.

## V

 After argument we noted, *sua sponte,* a fundamental issue as to whether the multiple convictions for receipt and possession of more than one weapon at the same time were valid. Supplemental briefs were requested on these questions, which we have considered. We conclude that Valentine was improperly convicted on multiple counts and accordingly the conviction on one of the possession counts and one of the reception counts must be vacated.[9]

Uncertainty as to the unit of prosecution intended by Congress under the statutes in question exists because of the use of the ambiguous word "any" in defining the crimes. Section 922(h) reads in pertinent part as follows:

It shall be unlawful for any person—

(1) who . . . has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

. . . .

to receive *any* firearm or ammunition which has been shipped or transported in interstate or foreign commerce. (Emphasis added).

Similarly 18 U.S.C.App. § 1202(a) reads in part:

Any person who—

(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,

. . . .

and who receives, possesses, or transports in commerce or affecting commerce, . . . *any* firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. (Emphasis added).

 Judicial construction of these statutes is guided by the Supreme Court's treatment of a similar ambiguity in the Mann Act, 18 U.S.C. § 2421. In *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the Court held that only one offense under the Mann Act occurred where the defendant transported two women across state lines on the same trip and in the same vehicle. This holding is based on

---

9. The Government has suggested that we apply the concurrent sentence doctrine and decline to consider these issues. We believe, however, that they should be addressed, particularly because of the collateral consequences of the criminal convictions. *See United States v. Montoya,* 676 F.2d 428 (10th Cir.1982).

two related axioms: the first is that Congress and not the courts should define the conduct to be punished by the criminal law; the second, a corollary to the first, is that when the intent of Congress as to the unit of prosecution cannot be clearly discerned, doubt must be resolved in favor of lenity. The Court stated (349 U.S. at 83–84, 75 S.Ct. at 622):

> When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this is not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. This is no wise implies that language used in criminal statutes should not be read with the saving grace of common sense with which other enactments, not cast in technical language, are to be read. Nor does it assume that offenders against the law carefully read the penal code before they embark on crime. It merely means that if Congress does not fix the punishment for a federal offense clearly and without

ambiguity, doubt will be resolved against turning a single transaction into multiple offenses . . . .

The quoted portions of sections 922 and 1202 reveal that they suffer from the same ambiguity that faced the Court in *Bell.* When a convicted felon simultaneously possesses two guns, for example, the definition of the offense in section 1202 as possession of *any* firearm permits both the conclusion that only one offense has been committed and the conclusion that two separate crimes have occurred. This same problem of construction occurs several times in section 922. Indeed, review of the cases shows that the courts uniformly have concluded that the rule of *Bell* should be applied whether the statute in question is section 1202 or any of the several subsections of section 922.

In a leading case under section 1202 the Eighth Circuit made a thorough analysis of the statutory language, the legislative history, and the statutory scheme in an unsuccessful attempt to resolve the ambiguity. *United States v. Kinsley,* 518 F.2d 665 (8th Cir.1975). Finding nothing in these sources that would resolve the doubt, the court held that the rule of lenity should apply and that absent a showing of separate receipt or separate storage, simultaneous possession of several weapons constitutes only one offense under section 1202. Other courts have uniformly reached the same conclusion.[10]

**10.** At least seven other circuits have now reached similar results under either section 922 or section 1202, or under both. *See, e.g., United States v. Marino,* 682 F.2d 449, 450–55 (3d Cir.1982) (§ 1202); *United States v. McCrary,* 643 F.2d 323, 325–28 (5th Cir.1981) (§ 1202); *Brown v. United States,* 623 F.2d 54, 56–59 (9th Cir.1980) (false statements in connection with acquisition of firearm, § 922(a)(6)); *United States v. Mason,* 611 F.2d 49 (4th Cir.1979) (receipt under § 922(h)(1) and false statements under § 922(a)(6)); *United States v. Powers,* 572 F.2d 146, 150–52 (8th Cir.1978) (extending *Kinsley* to case involving receipt under § 922(h)(1)); *United States v. Rosenbarger,* 536 F.2d 715, 720–22 (6th Cir.1976) (§ 1202), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *United States v. Calhoun,* 510 F.2d 861, 869 (7th Cir.) (§ 1202), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d

104 (1975); *McFarland v. Pickett,* 469 F.2d 1277 (7th Cir.1972) (§ 922(j), concealing stolen firearms); *United States v. Carty,* 447 F.2d 964, 965–66 (5th Cir.1971) (§ 922(i), interstate transportation of stolen firearms). *Cf. Sanders v. United States,* 441 F.2d 412 (10th Cir.1971) (simultaneous possession of two unregistered firearms is two offenses under 26 U.S.C. § 5861(d); *Bell v. United States* distinguished because § 5861(d) uses the article "a" instead of "any"), *cert. denied,* 404 U.S. 846, 92 S.Ct. 147, 30 L.Ed.2d 82 (1971).

We also note that in *United States v. Wolfenbarger,* 696 F.2d 750 (10th Cir.1982), we affirmed convictions on two counts under § 1202 where it appears that possession of the two weapons was simultaneous. The issue we treat was not considered or decided there, however.

The *Bell* opinion, the overwhelming weight of the authorities, and the absence of any argument by the Government against adoption of the general rule of construction applied in *Bell* persuade us that we should apply that rule in construing these statutes. We therefore hold that simultaneous possession of more than one weapon constitutes only one offense under 18 U.S.C.App. § 1202. We likewise hold that simultaneous receipt of more than one weapon constitutes only one offense under 18 U.S.C. § 922(h).

■ We turn now to the application of these rules to the facts of the instant case. The Government contends that this case is distinguishable from the cases cited above and that the separate convictions are proper because there was evidence of separate receipt of the shotgun and the pistol. The testimony of the prosecution's witness, Ammon, was that he first brought the pistol to Valentine's residence and then, "shortly after that," he delivered the shotgun to the defendant's house. IV R. 174–75. There was no other evidence on the time of the transactions or on any other details. This testimony could be accepted as sufficient to prove two separate and distinct acts of receipt. We are aware, also, that several courts have held or remarked in dicta that proof of separate receipt (or separate storage) of two weapons is sufficient to establish two separate offenses of possession. *See, e.g., United States v. Oliver,* 683 F.2d 224, 231–33 (7th Cir.1982); *United States v. Bullock,* 615 F.2d 1082 (5th Cir.1980); *United States v. Killebrew,* 560 F.2d 729 (6th Cir.1977).[11]

The problem with the Government's theory is that, although there was uncontroverted evidence of separate delivery of the two guns, the jury did not find and was not asked to find that there had been, indeed, two separate acts. Under the cases relied on by the Government, separate receipt is a necessary element for multiple convictions under both section 922 and section 1202. It is therefore axiomatic that the defendant has a right to a jury finding on this essential issue. In this case the indictment, as read by the trial judge at the opening of the trial, merely informed the jurors that Valentine was charged with receiving the pistol and the shotgun on or about March 20, 1981, IV R. 90, and with possessing the two guns on or about April 7, 1981, IV R. 91. The instructions similarly referred to those dates, with no other mention of time or date. III R. 55, 58, 61, 63. The record is totally devoid of any indication that the jury was requested to or did make a finding that the two weapons were separately received; to the contrary, the record clearly shows that the importance of this distinction was never realized and that the jury accordingly made no determination thereon. Without deciding whether § 922(h) and § 1202 should be construed to support multiple convictions because separate times of receipt and possession are shown by this evidence, we conclude that the multiple convictions cannot stand here because the critical jury findings on such elements were not made. Hence we must vacate the convictions and sentences as to Counts Five and Seven.[12]

## VI

Accordingly the judgment is affirmed as to the convictions and sentences on Counts One, Two, Three, Four, and Six; the convictions and sentences on Counts Five and Seven are vacated and set aside.

---

11. Dicta to the same effect is found in several of the previously cited cases, including *Marino, McCrary, Rosenbarger,* and *Calhoun.* Similarly, dictum in *McFarland* indicates that proof of separate receipt of several stolen weapons would justify separate convictions for concealment of the weapons under § 922(j).

12. *See United States v. Bullock,* 615 F.2d 1082, 1086 (5th Cir.1980) (dissenting opinion of Judge Goldberg).